UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TAMMI GREEN,<br><br>                    Plaintiff,<br><br>   -against-<br><br>ORANGE COUNTY, JOSHUA CONCA, GREG PALMER, BRIAN SEDITA, ANGELO NARCISE, MICHAEL LATTIMER, NICHOLAS GESSNER, DANIEL MULLINS, JOHN DOES #1-8, in their individual capacities,<br><br>                    Defendants. | No. 25 Civ. 3278<br><br>**AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiff Tammi Green, by and through her attorneys, CAIR New York ("CAIR-NY") and Kaufman Lieb Lebowitz & Frick LLP, for her Complaint alleges as follows:

**PRELIMINARY STATEMENT**

1.      This case is about religious discrimination that Plaintiff Tammi Green suffered at the hands of Orange County, New York and its officials.

2.      As a practicing Muslim woman, Plaintiff Tammi Green uses a hijab, or headscarf, to cover her hair and neck.

3.      For Ms. Green, as for hundreds of millions of Muslim women worldwide, covering herself is a symbol of her faith and the fulfillment of her devotion to Allah.

4.      Ms. Green is religiously obligated to always wear a hijab in the presence of men who are not immediate family or otherwise closely related to her. For more than two decades, she has never willingly been seen in public without it.

5.      On February 2, 2024, a group of predominantly male officers at the Orange County Sheriff's Office forced Ms. Green to remove her hijab twice: first, for post-arrest processing photographs and second, for her jail identification card.

6.      They also prohibited Ms. Green from wearing her hijab for more than 12 hours as she awaited arraignment.

7.      Distraught, Ms. Green pled with the officers and explained that her religious beliefs required her to wear her hijab in front of them.

8.      The officers told her, "You can't put that fucking thing on," and threatened her with a disciplinary violation if she failed to comply with their orders.

9.      While incarcerated in the Orange County Jail, officials required Ms. Green to carry and present her identification card with a photo of her uncovered without her hijab for several months—which, for Ms. Green, was akin to being naked.

10.     The forced removal of Ms. Green's hijab for her booking and identification photographs is representative of Orange County's broader custom or practice of requiring inmates to remove religious head coverings upon entry into the jail: Ms. Green knows of several other individuals who were forced to remove their religious garb in similar circumstances, and Ms. Green herself had been forced to remove her hijab on dozens of occasions during prior bookings.

11.     Orange County Jail officers also confiscated Ms. Green's hijab and purposefully broke her misbahah, or prayer beads, during a targeted cell sweep in late August 2024.

12.     After the sweep, Ms. Green had no hijab for several weeks.

13.     Without her hijab, Ms. Green was unable to pray for herself or her family, including her six daughters, her mother (who passed away in November 2024), and her sister (who passed away in the spring of 2025 after being diagnosed with a brain tumor).

14.     In addition to the forced removal of Ms. Green's hijab and confiscation of her hijab and misbahah, Defendants have failed to accommodate Ms. Green's dietary requirements as a Muslim, often leaving her no choice but to go without food for extended periods of time.

15.     Defendants have also targeted Ms. Green for retaliatory searches and desecrated her religious items by breaking them or throwing them on the floor.

16.     These actions violate Ms. Green's religious and civil rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

17.     This treatment has been traumatizing and humiliating for Ms. Green.

18.     Ms. Green now demands accountability for the illegal treatment and trauma she endured.

## JURISDICTION AND VENUE

19.     The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a).

20.     Venue lies in the Southern District of New York under 28 U.S.C. § 1391(b)(1) because Defendant Orange County is a municipal corporation organized under the laws of New York with its principal place of business in the Southern District of New York and, upon information and belief, all defendants reside in New York State.

## PARTIES

21.     Plaintiff Tammi Green is a 48-year-old Muslim woman who is currently incarcerated at the Orange County Jail in Orange County, New York.

22.    Defendant Orange County is a municipal corporation organized under the laws of New York with its principal place of business in Goshen.

23.    Defendant Joshua Conca is an Orange County law enforcement officer assigned to the Orange County Sheriff's Office.

24.    Defendant Greg Palmer is an Orange County law enforcement officer assigned to the Orange County Sheriff's Office.

25.    Defendant Brian Sedita is an Orange County law enforcement officer assigned to the Orange County Sheriff's Office.

26.    Defendant Angleo Narcise is a correctional officer at the Orange County Jail.

27.    Defendant Michael Lattimer is a correctional officer at the Orange County Jail.

28.    Defendant Nicholas Gessner is a Sergeant at the Orange County Jail.

29.    Defendant Daniel Mullins is a Sergeant at the Orange County Jail.

30.    Defendants John Does #1-4 are Orange County law enforcement officers whose identities are unknown at this time and who are assigned to the Orange County Sheriff's Office.

31.    Defendants John Does #5-8 are employees of Orange County whose identities are unknown at this time and who are assigned to the Orange County Jail.

32.    Defendants Conca, Palmer, Sedita, Narcise, Lattimer, Gessner, Mullins, and John Does #1-8 are hereinafter referred to collectively as the "Individual Defendants."

33.    The Individual Defendants are sued in their individual capacities.

**JURY DEMAND**

4

34.    Plaintiff demands a jury trial.

## FACTS

### *The Hijab*

35.    Ms. Green wears a hijab pursuant to her Muslim faith.

36.    A hijab is a headscarf that covers the wearer's hair, ears, and neck, but leaves her entire face exposed.

37.    For many observant Muslim women, including Ms. Green, the practice of Islam mandates wearing a hijab at all times when in the presence of an adult man to whom she is not married or sufficiently related.

38.    The hijab is core to Ms. Green's religious practice and covering herself is an essential component of her identity.

39.    To Ms. Green and hundreds of millions of Muslim women around the world, covering themselves is not merely a cultural tradition, or even a recommended practice, but the fulfillment of a commandment from God.

40.    For these women, appearing in public without a hijab, or being photographed without a hijab, is akin to being naked.

### *Ms. Green Is Forced to Remove Her Hijab For Her Booking Photo and Her Photo Identification Card*

41.    On February 2, 2024, Ms. Green was arrested and taken to the Orange County Sheriff's Office.[1]

---

[1] Ms. Green arrived at the Sheriff's Office following arrest processing at the Wallkill Police Department and the Middletown Police Department. Her hijab was removed for booking photos at the Wallkill Police Department, despite her protests, and then she was transferred to Middletown and Orange County with her hijab in a brown paper bag. Ms. Green was prohibited from wearing her hijab during transport. After her arrival at the Orange County Sheriff's Office, her hijab remained in the bag, which was given directly to her booking officer upon her arrival.

42. There, Defendants Conca and Palmer, along with John Does #1-2, forced Ms. Green to have her photo taken uncovered.

43. Ms. Green pleaded with the officers to allow her to wear her hijab.

44. She explained that her hijab is not an ordinary article of clothing and that she wears it because of her religious faith. She told them that, because she is Muslim, her hijab is only to be removed in front of her immediate family members and that it was not appropriate for her to remove it for the photograph.

45. The officers refused.

46. They took her booking photos uncovered and forced her to wait for her arraignment uncovered.

47. After the photographs were taken, Ms. Green was taken to a holding cell where she waited for approximately 12 hours.

48. During this time, Ms. Green remained prohibited from wearing her hijab.

49. Next, Ms. Green was taken to her arraignment.

50. John Does #1-4 prevented Ms. Green from wearing her hijab while she was taken to and remained inside the courthouse for her arraignment.

51. When she returned to the Orange County Sheriff's Office following her arraignment, she had her photo taken while her head was uncovered again, this time for her jail identification card.

52. Defendants Sedita and John Does #3-4, all of whom are male, took the photo for Ms. Green's jail identification card.

53. Once again, Ms. Green begged to wear her hijab for the photos.

54. Although she explained that her religious beliefs required her to wear her hijab in front of them, the officers rejected her request.

55.    One officer told her, "you can't put that fucking thing on."

56.    As Ms. Green continued to plead with the officers, they threatened her with a disciplinary violation (that would result in a $25 ticket) if she failed to comply with their orders.

57.    Defeated, Ms. Green acquiesced.

58.    Ms. Green felt hurt and violated both by having to appear before the male officers and by having her photo taken for a second time without her hijab, in severe violation of her religious beliefs.

### *Ms. Green's Uncovered Photo Identification Card is a Daily Reminder of Her Violation*

59.    Ms. Green was forced to use her hijab-less photo identification card at Orange County Jail daily for more than eight months.

60.    She felt deep shame and emotional trauma every time she showed male officers the uncovered photograph, which was multiple times per day.

61.    Identification cards are a vital part of life inside Orange County Jail.

62.    The card is pinned to her jumpsuit, which she must wear whenever she is outside her cell. Inmates must show them to access every checkpoint and program in the facility.

63.    Ms. Green uses her identification card five to six times per day. She must present it to Orange County Jail personnel whenever she enters or leaves her unit, goes to work, accesses the law library, attends religious services and parenting classes, and visits the parole room and medical ward.

64.    Because she was required to display and present the uncovered photo constantly, her beliefs were violated constantly.

65.     The knowledge that her photo existed on the jail's internal database and could be viewed by male staff members at any time further deepened Ms. Green's pain.

66.     Ms. Green filed three grievances in 2024 concerning the removal of her hijab for photographs at Orange County Jail: The grievances were filed on August 20, September 3, and October 20.

67.     In them, Ms. Green described that she was threatened by officers when she initially refused to take off her hijab based on her religious beliefs as a Muslim woman.

68.     After several months of daily humiliation, Ms. Green was finally permitted to take a new, covered photo for her identification card in late October 2024.

69.     To the extent the old, uncovered photo remains in the County system, however, the harm is ongoing.

### *Orange County Has a Custom or Practice of Forcing Religiously Observant Individuals to Remove Religious Head Coverings for Photos*

70.     The forced removal of Ms. Green's hijab for her booking and identification photos were not isolated incidents: Ms. Green knows of at least four other women who had their religious head coverings removed for photos at the jail, and she has also been forced to remove her hijab on dozens of prior occasions while being booked at the jail.

71.     One woman, Crystal Rios, was told to remove her hijab on multiple occasions, including for her booking and prison identification photo.

72.     On information and belief, Ms. Rios was told by Orange County officials to "take that sheet off [her] head." The officers also referred to her hijab as a "pillowcase."

73.     A second incarcerated individual, who is in her mid-30s, also had her hijab removed for her booking and prison identification photos. On information and belief,

she and Ms. Rios grieved the forced removal of their hijabs upon learning that Ms. Green was permitted to take a new identification photo in October 2024.

74.    A third woman, an Orthodox Jew, was forced to remove her religious headscarf for her booking and prison identification photos.

75.    A fourth woman that Plaintiff is aware of was similarly told to remove her religious head covering, not only just for her booking and prison identification photos, but also for the entirety of her time in Orange County Jail.

76.    Ms. Green has also been forced to remove her hijab on every occasion in which she was previously booked at Orange County Jail, for an estimated total of over 30 times.

77.    Taken together, these allegations demonstrate that Orange County has a custom or practice of forcing religiously observant individuals to remove their head coverings for photos.

### Ms. Green's Hijabs and Quran Are Confiscated And Her Misbahah Are Broken, Leaving Her Uncovered and Unable to Pray for Several Weeks

78.    On several occasions, Orange County officials confiscated Ms. Green's hijab and other religious items and refused to return them.

79.    Her hijab was first confiscated during processing on February 2, 2024. Ms. Green was told that the Middletown Police Department, where she was originally processed, had sent her hijab to the property division at Orange County Jail.

80.    Several hours later, she was told by Orange County officers that the hijab had never arrived.

81.    Later, Ms. Green's father called the Middletown Police Department, who confirmed that the hijab had been transferred with her to Orange County Jail.

82.     It therefore appears that the Orange County officers intentionally confiscated her hijab, leaving her without it for approximately four weeks, until Imam Khidar—the chaplain at Orange County jail—provided her with two new hijabs.

83.     Officers again confiscated Ms. Green's hijabs on August 20, 2024, when they targeted her for a cell sweep in retaliation for a verbal complaint she had made the day before.

84.     On August 19, Ms. Green had approached Defendant Gessner to make a verbal complaint that several inmates, including herself, were being deprived of a sufficient amount of recreation time.

85.     Several individuals, including other officers and inmates, were nearby and overheard Ms. Green communicating this verbal complaint.

86.     During their conversation, Ms. Green cited the jail's regulations, which require a minimum of seven hours of recreation time in a 24-hour period.

87.     Another Orange County official, Lieutenant Cimarelli, who overheard the conversation, agreed with Ms. Green and informed Sgt. Gessner that he needed to change the schedule to provide for the mandatory recreation time.

88.     On information and belief, Defendants Narcise and Lattimer were made aware of Ms. Green's August 19 complaint by Sgt. Gessner, Lt. Cimarelli, and/or other Orange County Jail officers or inmates.

89.     Early the following morning, while Ms. Green was sleeping around 7:00 or 8:00 a.m., Defendants Narcise, Lattimer, Gessner, and John Doe #5, all of whom are male, ordered her to exit her cell, face the wall, and submit to a cell search.

90.     Ms. Green asked if she could put on her hijab first before complying, but the officers refused, forcing Ms. Green to leave her cell uncovered. Defendant Narcise

then entered Ms. Green's room to conduct a search, followed by Defendant Gessner. While Defendants Narcise and Gessner searched, Defendants Lattimer and John Doe #5 monitored Ms. Green as she faced the wall outside the cell.

91.     After the officers finished and left, Ms. Green re-entered her cell to find that both of her hijabs had been confiscated, along with her Quran, the central religious text of Islam.

92.     She also found that the string of her misbahah had been broken, and the beads were scattered throughout the floor of her cell.

93.     Defendant Gessner and the other Defendant officers who had searched Ms. Green's cell knew that the misbahah were a religious item, as inmates are not permitted to keep any other type of personal property.

94.     As the officers left her cell, Defendant Gessner told her, "The next time you want to quote the law at me, you should know that I am the law in here."

95.     Ms. Green's cell was the only cell that was searched in the unit.

96.     Several hours after the sweep, Ms. Green requested a grievance form from Sgt. Gessner to address the confiscation of her hijabs.

97.     In response, Defendant Gessner replied sarcastically, "Yeah, I'll get right on that." He then confirmed, "I'm not bringing you anything."

98.     Three days later, Ms. Green was finally granted a grievance form from another officer, and Ms. Green submitted her grievance that day.

99.     The officers in the Orange County Jail never returned Ms. Green's hijabs to her.

100.     She was forced to live without a hijab for 22 days, until September 11, when Imam Khidar gave her a hijab that he had donated with his own funds.

101.    In late August, Imam Khidar had visited the facility to facilitate religious education for the Muslim inmates and discovered that Ms. Green was uncovered.

102.    When Imam Khidar asked Ms. Green why she was not covered, she explained to him what had happened.

103.    He complained to the Watch Commander, Lieutenant DeAntromand, that the confiscation violated Ms. Green's religious rights.

104.    Despite his complaint, officers at the jail continued to refuse to return her hijabs, and Ms. Green was forced to live without one until the Imam was able to return on September 11 with the new covering.

105.    Ms. Green's grievance was denied on September 3 under the false reasoning that a black hijab was "observed and placed on [her] chair" during the sweep.

106.    No hijab was placed on her chair or left in her cell.

107.    The decision also incorrectly assumed that she had only one hijab, rather than two, and that "no other religious items or necklaces were observed."

108.    Ms. Green appealed the decision the same day, but the appeal was denied on the merits without explanation.

109.    Ms. Green therefore exhausted her available administrative remedies to no avail.

### *Officers Raid Ms. Green's Cell a Second Time, Destroying her Misbahah and Desecrating her Quran*

110.    In January 2025, Ms. Green's misbahah were destroyed during a retaliatory and targeted search of her cell.

111.    Around 7:30 a.m. on the morning of January 18, an announcement was made on the loudspeaker that Ms. Green's unit was going to be searched for metal spoons that had been given to all the inmates by mistake.

112.    On information and belief, metal spoons had not been given to the inmates in the unit.

113.    In a subsequent search, Defendant Narcise, who had participated in the August 20 cell sweep, entered Ms. Green's cell accompanied by with John Does #6-8.

114.    When the sweep was finished, Ms. Green noticed that her Quran had been tossed to the ground and her misbahah had been confiscated.

115.    The damage done to Ms. Green's religious items was malicious, targeted, and unnecessary.

116.    Not only had her Quran been tossed to the ground, but also it appeared that Defendant Narcise had purposefully stepped on it.

117.    Defendant Narcise had also torn apart Ms. Green's religious notes and stole her misbahah out of her cell for no legitimate law enforcement purpose.

118.    Again, Ms. Green requested a grievance, and again, she was denied.

119.    Ms. Green finally obtained a grievance form and submitted it on January 19. In her grievance, she complained that the officers involved in the cell search had thrown her Quran on the floor and trampled on it. Officers also ripped up her religious notes and removed her misbahah.

120.    In her grievance, Ms. Green alleged that the officers' conduct was in retaliation for the prior grievances that she submitted regarding the August 20, 2024, cell search, of which Defendant Narcise was previously made aware, as well as the

demand letter she submitted to Orange County through legal counsel on December 10, 2024.

121.    On information and belief, Defendant Narcise was made aware of the demand letter days before the January 18 cell search and destruction and confiscation of her religious property.

122.    On January 28, 2025, Orange County Sheriff denied Ms. Green's grievance, on the grounds that there was insufficient evidence to support her claims. Ms. Green appealed the decision, which was denied on the merits without explanation one day later. Ms. Green therefore exhausted her available administrative remedies to no avail.

### *Orange County Officials Continue to Enact Burdensome Obstacles to Ms. Green's Religious Observance*

123.    Ms. Green has been denied religious meals on several occasions, causing her to fast for extended periods of time at great risk to her health.

124.    In March 2025, Ms. Green observed 30 days of fasting during the month of Ramadan, called *sawm*, a core tenet of the Muslim faith.

125.    Each day during Ramadan, all Muslims who are physically able must abstain from ingesting anything from dawn until sunset, including food, water, and medication.

126.    To accommodate this observance, Orange County Jail allows Muslim inmates to apply for a modified meal schedule during Ramadan, whereby meals are served twice daily, before dawn and at sunset.

127.    Under this program, Orange County Jail delivers Muslim inmates any prescribed medication together with their pre-dawn meals, so that they can take it before beginning their fast.

128.    While Orange County Jail does not offer meals compliant with Muslim dietary restrictions ("Halal"), they do offer Kosher meals, which involve similar dietary restrictions.

129.    Many inmates, including Ms. Green, opt for Kosher meals as the closest available approximation of their Halal diet, as opposed to the default, non-religious meals.

130.    Ms. Green has received Kosher meals since entering Orange County Jail. In February 2025, Ms. Green applied for and was granted the Ramadan meal program.

131.    Ms. Green takes milk of magnesia, a prescription laxative, to relieve constipation symptoms associated with Type 2 diabetes.

132.    It is especially important for Muslims with diabetes, like Ms. Green, to have their meals on time during Ramadan, since fasting affects their blood sugar levels.

133.    For the first four days of Ramadan, March 1-4, Ms. Green's Kosher meals and medication were delivered as expected.

134.    However, on the evening of March 4, Ms. Green was delivered a non-religious meal containing ingredients which she is forbidden from eating according to the tenets of her religion.

135.    Because she could not eat the food that was delivered, Ms. Green was unable to break her fast that evening.

136.    Ms. Green informed Defendant Mullins, the officer in charge of delivering meals, about the problem. Rather than arranging for a Kosher meal to be delivered, he gave her a grievance form, which she submitted the next day.

137.    The grievance, which Ms. Green filed the next day, was denied in part on the false basis that she had never enrolled in the Ramadan meal program, even though she had received Ramadan meals from March 1 until March 4.

138.    Ms. Green went to sleep on the evening of March 4 without eating anything since 5:00 a.m. that morning.

139.    On the following morning of March 5, Orange County Jail failed to deliver Ms. Green her pre-dawn meal altogether, including her prescribed milk of magnesia.

140.    Having already gone 24 hours without food and medication, Ms. Green was forced to begin her fast once again.

141.    By this point, Ms. Green was feeling extremely unwell. She felt exhausted and nauseous from the lack of food. She suffered severe gastrointestinal pain from the lack of medication.

142.    Ms. Green informed officers that she was too unwell to perform her duties in her job as a kitchen worker.

143.    In response, Sgt. Miller immediately fired Ms. Green from a position she had held for over 10 months.

144.    Ms. Green was finally able to break her fast around 6:00 p.m. on March 5, after going almost 37 hours without food.

145.    Ms. Green's food has often been non-compliant with her religious dietary needs.

146.    On at least two occasions in January and February 2025, officers at Orange County Jail delivered a serving-size box of Lucky Charms to Ms. Green and the other Muslim inmates in lieu of a meal. Because Lucky Charms is a cereal containing pork-derived gelatin, it does not meet the requirements of a Kosher or Halal diet.

147.    Both times, Ms. Green refused the cereal and explained to the officers that it was prohibited according to her religious diet. Other Muslim inmates also explained the problem to the officers.

148.    Later, on March 24, the same officers delivered Lucky Charms to Ms. Green, this time as the pre-dawn Ramadan meal given to all Muslim inmates. Because she could not eat the cereal, Ms. Green was forced to start her fast on an empty stomach for the second time that month.

149.    For the next 48 hours after this incident, officers at Orange County Jail repeatedly denied Ms. Green the grievance form she requested.

150.    Ms. Green was eventually permitted to submit a grievance regarding the meals. On March 31, that grievance was accepted and denied in part. The Grievance Coordinator ordered that cereals containing pork-derived gelatin would no longer be served to Ms. Green and the other Muslim inmates.

151.    The Grievance Coordinator also found that the officers who served the cereal did not know it was prohibited for the Muslim inmates to eat, even though Ms. Green and others explained the problem to the officers at least twice before.

152.    Ms. Green also continues to be targeted for retaliatory searches and the unlawful confiscation of her religious items.

153.    On April 1, around 8:00 p.m., officers at Orange County Jail began a surprise contraband search of Ms. Green's entire unit.

154.    Ms. Green was taken from her cell, escorted outside her unit, and subjected to a full-body search. While Ms. Green was away, other inmates in her unit observed multiple officers enter her cell.

155.    During the cell search, one officer took Ms. Green's spare hijab and threw it off the ledge outside the cell. The hijab fell several feet from the upper level of the unit to the floor one story below.

156.    Ms. Green's spare hijab was never returned to her.

157.    The desecration and confiscation of Ms. Green's hijab during the April 1 search was targeted, malicious, and served no legitimate law enforcement purpose.

158.    After this incident, officers at Orange County Jail repeatedly denied Ms. Green a grievance form when requested. She was able to file a grievance two days later, on April 3. The following day, Lt. DeAntromand told Ms. Green that her grievance is pending an investigation into the matter by Orange County Jail.

### *Ms. Green's Mental Health Rapidly Declines as She Is Prevented from Practicing Her Religion*

132.    The actions of Orange County and its agents have violated Ms. Green's religious rights and have devastated her.

133.    As federal courts have recognized, "[a] Muslim woman who must appear before strange men she doesn't know, with her hair and neck uncovered in a violation of her religious beliefs, may feel shame and distress." *Khatib v. County of Orange*, 639 F.3d 898, 907 (9th Cir. 2011) (Gould, J., concurring).

134.    The forced removal of Ms. Green's hijab for photographs caused her to feel exposed and humiliated.

135.    And for more than nine months, she was forced to relive her trauma every time she presented her identification card to a male officer.

136.    Moreover, without her hijab and misbahah, Ms. Green was unable to pray.

137.    The disconnect with her faith has taken a drastic toll on her mental health as she navigates a difficult time not only for herself but also her family.

138.    Her mother, who had been ill with stage 4 cancer, passed away at the end of October 2024. Her sister was also diagnosed with brain tumors in the fall of 2023, and she passed away in the spring of 2025.

139.    Ms. Green has despaired for her family, including her six daughters between the ages of nine and 30.

140.    The experience of being robbed of her religious garb and unable to pray for her family was mentally draining.

141.    Ms. Green has prayed daily for more than 30 years.

142.    Prayer is a powerful force for her that keeps her motivated and puts her mind at ease.

143.    Without it, she experienced depression, overwhelming grief, and frequent emotional breakdowns that left her sobbing and confused about her faith and how to live her life.

144.    The continued violation of Ms. Green's rights by Orange County officials further exacerbates Ms. Green's emotional distress.

145.    When she is denied religiously compliant food, Ms. Green is exhausted by and anxious about the effects of prolonged fasting on her diabetes condition.

146.    When she is repeatedly targeted for searches and her religious belongings are confiscated or treated with disrespect, she feels further isolated and anguished.

147.    Ms. Green has visited mental health services at the facility four times since August to discuss the devastating emotional impact caused by these religious violations.

**CAUSES OF ACTION**

**FIRST CLAIM**
**42 U.S.C. § 1983: First and Fourteenth Amendments**
**Free Exercise**
**Against Defendants Conca, Palmer, Sedita, Narcise, Lattimer, Gessner,**
**Mullins, and John Does #1-8**

148.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

149.    42 U.S.C. § 1983 prohibits any person acting under color of state law, custom, or usage to deprive a citizen of rights secured by the Constitution.

150.    Under the First Amendment to the Constitution of the United States, enforceable against the States through the Due Process Clause of the Fourteenth Amendment, Plaintiff has a clearly established right to freely exercise her religion.

151.    By denying Plaintiff's request to wear her hijab for booking photographs at the Orange County Sheriff's Office on February 2, 2024, Defendants Conca, Palmer, and John Does #1-2 deprived Plaintiff of her right to freely exercise her religion in contravention of the Free Exercise Clause.

152.    By denying Plaintiff's request to wear her hijab for identification card photographs at the Orange County Jail on February 2, 2024, Defendant Sedita and Defendants John Does #3-4 deprived Plaintiff of her right to freely exercise her religion in contravention of the Free Exercise Clause.

153.    By confiscating her hijabs and destroying her misbahah on August 20, 2024, Defendants Narcise, Lattimer, Gessner, and John Doe #5 rendered Plaintiff

unable to pray, depriving her of her right to freely exercise her religion in contravention of the Free Exercise Clause.

154.    By confiscating her hijabs and destroying her misbahah on August 20, 2024, Defendants Narcise, Lattimer, Gessner, and John Doe #5 rendered Plaintiff unable to pray, depriving her of her right to freely exercise her religion in contravention of the Free Exercise Clause.

155.    By confiscating her misbahah, tossing and trampling on her Quran, and tearing up her religious notes on January 18, 2025, Defendants Narcise and John Does #6-8 rendered Plaintiff unable to pray, depriving her of her right to freely exercise her religion in contravention of the Free Exercise Clause.

156.    By failing to provide Ms. Green with meals at appropriate mealtimes during Ramadan and by failing to provide Ms. Green with meals that complied with her religious dietary requirements, Defendant Mullins deprived Ms. Green of her right to freely exercise her religion in contravention of the Free Exercise Clause.

157.    At all relevant times, Defendants acted under color of state law.

158.    The conduct of Defendants was willful, wanton, and reckless.

159.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff sustained damages, and suffered and continues to suffer, mental anguish, physical and emotional distress, humiliation, and embarrassment.

160.    Defendants Conca, Palmer, Sedita, Narcise, Lattimer, Gessner, Mullins, and John Does #1-8 are liable to Plaintiff under 42 U.S.C. § 1983 for the damages hereinbefore alleged.

**SECOND CLAIM**
**42 U.S.C. § 1983: Fourth and Fourteenth Amendments**
**Failure to Intervene**
**Against Defendants Conca, Palmer, Sedita, Narcise, Lattimer, Gessner,**
**Mullins, and John Does #1-8**

161.    Defendants Conca, Palmer, Sedita, Narcise, Lattimer, Gessner, Mullins and John Does #1-8 deprived Plaintiff of her constitutional rights under color of law and failed to intervene to prevent the aforementioned deprivations despite having an opportunity to do so.

162.    On February 2, 2024, during Plaintiff's booking and arraignment, Defendants Conca, Palmer, Sedita, and John Does #1-4 were aware of multiple violations of Plaintiff's constitutional rights, had a reasonable opportunity to intervene, and chose not to do so in contravention of clearly established law, proximately causing injury to Plaintiff.

163.    On August 20, 2024, during the sweep of Plaintiff's cell, Defendants Narcise, Lattimer, Gessner, and John Doe #5, were aware of multiple violations of Plaintiff's constitutional rights, had a reasonable opportunity to intervene, and chose not to do so in contravention of clearly established law, proximately causing injury to Plaintiff.

164.    On January 18, 2025, during another sweep of Plaintiff's cell, Defendants Narcise and John Does #6-8, were aware of multiple violations of Plaintiff's constitutional rights, had a reasonable opportunity to intervene, and chose not to do so in contravention of clearly established law, proximately causing injury to Plaintiff.

165.    In January through March 2025, Defendant Mullins was aware of multiple violations of Plaintiff's constitutional rights, had a reasonable opportunity to intervene,

and chose not to do so in contravention of clearly established law, proximately causing injury to Plaintiff.

166.    At all relevant times, Defendants were acting under color of state law.

167.    The conduct of Defendants was willful, wanton, and reckless.

168.    Defendants Conca, Palmer, Sedita, Narcise, Lattimer, Gessner, Mullins, and John Does #1-8 are liable to Plaintiff under 42 U.S.C. § 1983 for the damages hereinbefore alleged.

**THIRD CLAIM**
**Religious Land Use and Institutionalized Persons Act ("RLUIPA")**
**42 U.S.C. § 2000cc**
**Against Defendant Orange County**

169.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

170.    The RLUIPA provides: "No government shall impose a substantial burden of the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000cc-1(a)(1)-(2).

171.    Plaintiff is a "person" as defined under the RLUIPA. *See* 42 U.S.C. § 2000cc-1(a), 42 U.S.C. § 1997(3).

172.    Plaintiff's decision to wear a hijab constitutes a sincerely held religious belief.

173.    At all relevant times, Defendant Orange County met the definition of "government" under the RLUIPA. *See* 42 U.S.C. § 2000cc-5(4)(A)(i)-(iii).

174.    At all relevant times, the locations where Orange County Sheriff's Office personnel took Plaintiff's photographs, including the facilities located at 110 Wells Farm Road, Goshen, New York, constituted federally funded "institutions" as defined under the RLUIPA and the Civil Rights of Institutionalized Persons Act of 1980, 42 U.S.C. § 1997(1)(B)(ii)-(iii).

175.    Plaintiff was "residing in or confined to [an] institution[]" as that term is defined under the RLUIPA when the events alleged above occurred.

176.    Defendant Orange County's acts/omissions, policies, and/or customs substantially burdened Plaintiff's religious exercise by forcing her to remove her hijab while residing in or confined to the Orange County Jail, from February 2, 2024 until approximately four weeks later.

177.    Plaintiff's religious exercise was further substantially burdened by Defendant Orange County when she was forced to use her uncovered photo identification card several times per day from February 2, 2024 until late October 2024.

178.    Plaintiff's religious exercise was further substantially burdened by Defendant Orange County when her hijabs, Quran, and misbahah were confiscated or destroyed on August 20, 2024, rendering her uncovered and unable to pray for 22 days.

179.    Plaintiff's religious exercise was further substantially burdened by Defendant Orange County when her misbahah were confiscated on January 18, 2025.

180.    In addition, Plaintiff's religious exercise was further substantially burdened by Defendant Orange County when she was not given food at Ramadan-compliant mealtimes, and when she was given food that did not comply with her religious dietary requirements.

24

181.    Defendant Orange County's acts, omissions, policies, and/or customs do not further a substantial government interest.

182.    Defendant Orange County's acts, omissions, policies, and/or customs are not the least restrictive means of furthering a compelling government interest.

183.    As a direct and proximate result of Defendant's wrongful acts, omissions, policies, and/or customs, Plaintiff sustained damages, and has suffered and continues to suffer mental anguish, physical and emotional distress, humiliation, and embarrassment.

**FOURTH CLAIM**
**42 U.S.C. § 1983: First and Fourteenth Amendments**
**Municipal Liability**
**Against Defendant Orange County**

184.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

185.    Defendant Orange County has a policy, custom, or usage of forcing religiously observant individuals, including Muslim women, to remove their religious head-coverings for post-arrest photos, and/or has exhibited deliberate indifference to the known risk of constitutional injury occasioned by the Orange County Sheriff's Department's ongoing failure to accommodate the religious exercise of those whose religious beliefs prohibit them from removing their religious head-coverings for photographs during arrest processing, including booking and identification.

186.    Defendant Orange County's policy, custom, usage and/or deliberate indifference was a moving force behind the violation of Plaintiff's First and Fourteenth Amendment rights and proximately caused Plaintiff's injuries.

**FIFTH CLAIM**
**42 U.S.C. § 1983: First and Fourteenth Amendments**
**Retaliation**
**Against Defendants Narcise, Lattimer, Gessner, and John Doe #5-8**

187.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

188.    42 U.S.C. § 1983 prohibits any person acting under color of state law, custom, or usage to deprive a citizen of rights secured by the Constitution.

189.    Under the First Amendment to the Constitution of the United States, enforceable against the States through the Due Process Clause of the Fourteenth Amendment, Plaintiff has a clearly established right to petition the government for a redress of grievances relating to the conditions of her imprisonment.

190.    Defendants deprived Plaintiff of this right on August 20, 2024, when they raided her cell and confiscated or destroyed her religious items in retaliation for a verbal complaint she made the day before to Defendant Gessner regarding Orange County Jail's failure to adhere to its recreation schedule policy.

191.    Defendants further deprived Plaintiff of this right on January 18, 2025, when, during a unit-wide cell raid, they trampled on her Quran, destroyed her religious notes, and confiscated her misbahah. These targeted actions were made in retaliation for the grievance she filed regarding the August, 20, 2024 incident, as well as the demand letter she submitted to Orange County through her legal counsel on December 10, 2024.

192.    Defendants also deprived Plaintiff of this right on April 1, 2025, when they removed her hijab from her cell, threw it on the ground, and confiscated it without reason. These targeted actions were made in retaliation for the December demand letter

and the grievances she submitted in March and April 2025 regarding the jail's refusal to provide her with religiously appropriate meals.

193.    Defendants' conduct would have deterred a similarly situated individual of ordinary firmness from exercising their right to freedom of speech. At all relevant times, Defendants acted under color of state law.

194.    The conduct of Defendants was willful, wanton, and reckless.

195.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff sustained damages, and suffered and continues to suffer, mental anguish, physical and emotional distress, humiliation, and embarrassment.

196.    Defendants Narcise, Lattimer, Gessner, and John Does #5-8 are liable to Plaintiff under 42 U.S.C. § 1983 for the damages hereinbefore alleged.

### SIXTH CLAIM
### Negligent Training and Supervision under New York Law
### Against Defendant Orange County

197.    Plaintiff repeats and realleges the preceding paragraphs as if set forth here.

198.    Defendant Orange County, through its individual officers and employees, owed a duty of care to Plaintiff to prevent the conduct alleged. Under the same or similar circumstances, a reasonably prudent and careful person should have anticipated that injury to Plaintiff or those in a like situation would probably result from the forgoing conduct.

199.    The individual Defendants were unfit and incompetent with respect to their positions and employment with Defendant Orange County.

200.    Defendant Orange County knew or should have known through the exercise of reasonable diligence that the Individual Defendants were unfit and incompetent and likely to cause injury to Plaintiff or those in a like situation.

201.    Upon information and belief, Defendant Orange County's negligence in screening, hiring, training, disciplining, supervising, and/or retaining the Individual Defendants directly and/or proximately caused Plaintiff's injuries.

202.    By virtue of the foregoing, Defendant is liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately screen, hire, train, discipline, and/or supervise its officers employed by Orange County with regard to the aforementioned constitutional and statutory duties to arrestees in their custody.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.    Compensatory damages in an amount to be determined at trial;

B.    Punitive damages against all Defendants except Orange County in an amount to be determined at trial;

C.    An injunction ordering Defendant Orange County to destroy all of Ms. Green's hijab-less photographs and any security footage showing Ms. Green without her hijab from their database(s);

D.    An injunction ordering Defendant Orange County to implement a policy change prohibiting Defendants or any other Orange County employee from taking booking photographs of Muslim women without their hijab and/or utilizing such photos as forms of identification in the database or on the prisoners' ID cards;

E.    Reasonable costs and attorneys' fees under 42 U.S.C. § 1988;

F.    Pre- and post-judgment interest to the fullest extent permitted by law; and

G.    Any additional relief the Court deems just and proper.

Dated:      June 9, 2025
            New York, New York


KAUFMAN LIEB LEBOWITZ              COUNCIL ON AMERICAN ISLAMIC
& FRICK LLP                       RELATIONS – NEW YORK

_____         _____
Alanna Kaufman                    Lamya Agarwala
Alyssa Isidoridy                  Burhan Carroll

18 E. 48th Street, Suite 802      80 Broad Street, 5th Floor
New York, New York 10017          New York, NY 10009
(212) 660-2332                    (646) 665-7599
akaufman@kllf-law.com             lagarwala@cair.com
aisidoridy@kllf-law.com           bcarroll@cair.com


                                  *Attorneys for Plaintiff*